In re BELMONT REALTY
CORPORATION, Debtor,
Appellant.

RHODE ISLAND HOSPITAL TRUST
NATIONAL BANK, Plaintiff,
Appellee,

v.

Elizabeth V. BOGOSIAN,
Defendant, Appellant.

Nos. 92–2405, 93–1075.

United States Court of Appeals,
First Circuit.

Heard June 7, 1993.

Decided Nov. 29, 1993.

Michael J. McGovern with whom Indeglia & McGovern, Providence, RI, was on brief for appellants.

Richard W. MacAdams with whom Myrna S. Levine and MacAdams & Wieck Inc., Providence, RI, were on brief for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

CAMPBELL, Senior Circuit Judge.

Rhode Island Hospital Trust National Bank (the "Bank") sued Elizabeth Bogosian on two separate promissory notes, one executed by Belmont Realty Corporation ("Belmont") and guaranteed by Bogosian (the "Belmont Note"), and one executed by Bogosian herself (the "Bogosian Note"). Bogosian filed certain defenses and counterclaims. The district court held that an earlier decision in a bankruptcy court adversary proceeding initiated by Belmont was res judicata as to Bogosian's counterclaims. The district court granted summary judgment for the Bank, finding in its favor on all counts of its amended complaint and dismissing all of Bogosian's counterclaims. Bogosian appeals. Belmont appeals from the district court's denial of its Rule 60(b) motion to amend the court's separate order dismissing Belmont's appeal from the bankruptcy court adversary proceeding. Bogosian's and Belmont's appeals were consolidated. We affirm in part and vacate and remand in part.

I.

Bogosian created Belmont for the purpose of purchasing and developing parcels of real estate in Newport and Middletown, Rhode Island. She secured a loan to Belmont of $1.2 million from the Bank. In 1987, Belmont executed and gave the Belmont Note to the Bank. Bogosian personally guaranteed the Belmont Note. Though she gave one-third of Belmont's stock to her son and one-third to her daughter, Bogosian herself controlled Belmont's activities.

Bogosian was a partner with her brother in a real estate company called E & J, which also had outstanding loans from the Bank. In 1986, E & J went into receivership because of a bitter management struggle between Bogosian and her brother. Bogosian accepted direct personal liability for one-half of E & J's debt to the Bank and executed the Bogosian Note in March 1989.

Never receiving the necessary governmental approvals for the development of the Newport and Middletown properties, Belmont defaulted on the Belmont Note in early 1989. In order to delay foreclosure on the properties, Belmont filed for bankruptcy protection in the United States Bankruptcy Court for the District of Rhode Island (the "Bankruptcy Proceeding"). In September 1989, the Bank brought the instant action in the United States District Court for the District of Rhode Island (the "District Court

Action") against Bogosian as Guarantor of the Belmont Note, seeking to collect the outstanding indebtedness due it from Belmont. In October 1989, the Bank amended its complaint to add a second claim against Bogosian based on the Bogosian Note. Bogosian admits that both notes remain unpaid.

One might think that such facts would lead, as the court below described wishfully, to "a simple action by a lender to collect on two promissory notes." Over the course of more than four years, however, the parties have battled over these promissory notes in three separate arenas: the United States District Court, the United States Bankruptcy Court, and now here. They leave behind them what the district court described as a "tortuous procedural trail."

## A. The Bankruptcy Proceeding

Initially, Bogosian ignored the · District Court Action, and a default judgment was entered against her. Her attentions may have been on the bankruptcy court where, in January 1990, Belmont filed an adversary complaint (the "Adversary Proceeding") against the Bank. Belmont asserted various claims based on an alleged oral agreement by the Bank not to call the Belmont Note until the purchased properties could be developed.

Less than six months later, the bankruptcy court issued a decision (the "Belmont Decision") dismissing Belmont's adversary complaint. The bankruptcy court determined that the alleged oral agreement would be unenforceable by virtue of the Statute of Frauds, R.I.Gen.Laws. § 9–1–4, and the parol evidence rule. *See In re Belmont Realty Corp.*, 116 B.R. 21 (Bankr.D.R.I.1990). Belmont appealed from the Belmont Decision to the district court (the "Bankruptcy Appeal").

## B. The District Court Action

Meanwhile, in March 1990, the district court withdrew the default judgment against Bogosian. The court allowed her to file counterclaims against the Bank asserting what were in essence the same claims based on an alleged oral agreement by the Bank not to call the Belmont Note, that had constituted Belmont's claims against the Bank in the Adversary Proceeding. On August 24,

1990, the district court dismissed Bogosian's counterclaims on the grounds that the parol evidence rule would prohibit introduction of evidence of the alleged oral agreement at trial.

In December 1990, however, the district court granted a motion by Bogosian to file amended counterclaims based on "newly discovered" information. The amended counterclaims were based on the same alleged oral agreement by the Bank, as well as new allegations of fraud and an alleged conflict of interest that the Bank had with respect to Bogosian's estranged family members.

## C. The Consent Order and the Dismissal of the Bankruptcy Appeal

At that point, there were two cases pending in the district court relating to Belmont and the Belmont Note—the Bankruptcy Appeal and the District Court Action. Due to the similarity of the issues involved in both cases, the parties agreed that the Bankruptcy Appeal should be continued *nisi* pending resolution of the District Court Action. Thus, on February 22, 1991, the district court entered a Consent Order setting out the agreement. The Order stated that the District Court Action "may resolve all pending issues," but made it clear that if "further proceedings in [the Bankruptcy Appeal] become necessary or desirable, any party may initiate it in the same manner as if this order had not been entered."

In effect, the order simplified the proceedings so that the issues between the parties would be resolved in the District Court Action rather than in the Bankruptcy Appeal. The Order did not refer to any agreement as to the res judicata effects of the Belmont Decision in the Adversary Proceeding.

■ The appeal notwithstanding, the Belmont Decision already constituted a final judgment for res judicata purposes. *See Katchen v. Landy*, 382 U.S. 323, 334, 86 S.Ct. 467, 475, 15 L.Ed.2d 391 (1966) (normal rules of res judicata apply to decisions of bankruptcy courts); *Turshen v. Chapman*, 823 F.2d 836, 839 (4th Cir.1987) (in bankruptcy case, a final resolution of an adversary proceeding has preclusive effect even if underly-

ing bankruptcy proceeding continues); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4433 (1981) (judgment has preclusive effect while appeal is pending).

So long as the bankruptcy proceeding was pending, however, the parties were under no practical compulsion to negotiate any agreement about the res judicata effects of the Belmont Decision. If the Bank raised a res judicata defense to Bogosian's counterclaims in the District Court Action, Belmont could simply reopen the Bankruptcy Appeal, pursuant to the Consent Order. It was not in the Bank's interest to raise the res judicata defense in the District Court Action because Belmont and Bogosian had an effective way to counter, i.e., by reopening the Bankruptcy Appeal.

The Consent Order, however, did not spell out any agreement as to what would happen to the Bankruptcy Appeal if the underlying Bankruptcy Proceeding were dismissed. This potentiality occurred little more than a year later.. On February 28, 1992, the United States Trustee filed a motion to dismiss the Bankruptcy Proceeding on the grounds that Belmont had failed to confirm a plan of reorganization and had never filed monthly cash flow and profit and loss statements, as required by the Trustee. The bankruptcy court dismissed the Bankruptcy Proceeding on March 20, 1992. Belmont did not object, and the dismissal was considered voluntary.

Neither Belmont nor Bogosian attempted to reopen the Bankruptcy Appeal. The district court, having been advised of the consensual dismissal of the Bankruptcy Proceeding, "passed," i.e., dismissed, the Bankruptcy Appeal on April 30, 1992.

Once the Bankruptcy Appeal was dismissed, Bogosian lost her ability to pursue that appeal as a counterweight to any assertion by the Bank of a res judicata defense to her counterclaims in the District Court Action. By leave of the court, the Bank accordingly amended its Answer to Amended Counterclaims to include defenses of res judicata and collateral estoppel. Shortly thereafter, in June, 1992, the Bank filed its motion for summary judgment.

Several months later, Belmont filed a motion in the district court pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, seeking to amend the district court's order passing the Bankruptcy Appeal. Belmont asked the court to clarify that the dismissal was "without prejudice to the right of Elizabeth V. Bogosian to raise any defense or make any assertion in the [District Court Action]." The district court denied the motion.

On November 20, 1992, the district court granted in entirety the Bank's motion for summary judgment. As for the Belmont Note, the district court dismissed Bogosian's amended counterclaims on res judicata grounds. The court rejected Bogosian's argument that the Consent Order should be construed to prohibit the Bank from raising its res judicata defenses. Regarding the Bogosian Note, the court dismissed Bogosian's amended counterclaims on the grounds that Bogosian's fraud and breach of fiduciary duty allegations could not succeed as a matter of law. These appeals ensued.

II.

As the issues pertaining to the Belmont Note and the Bogosian Note are distinct, we begin by considering the grant of summary judgment to the Bank on the Belmont Note. The key issue on appeal, as it was below, is whether the Belmont Decision in the Adversary Proceeding was res judicata in the District Court Action. We hold that it was. We disagree with the district court only in respect to Bogosian's fraud in the inducement claim, based on an alleged conflict of interest on the part of the Bank. We are uncertain at this time whether the Belmont decision had preclusive effect on that issue.

A. *The Application of Res Judicata.*

In granting summary judgment in favor of the Bank on its suit to collect on the Belmont Note, the district court held:

having had the opportunity to litigate these issues in the Bankruptcy Court, having received a final judgment on the merits (right or wrong), and having failed to protect its rights with respect to the appellate process, [Belmont] and those in privity

with it cannot attempt to relitigate these issues in this proceeding. On the facts of this case, any other result would undermine the primary goal of the doctrine of res judicata—that there be finality in litigation.

The district court's point was well taken. In *Dennis v. R.I. Hospital Trust Nat. Bank*, 744 F.2d 893, 898 (1st Cir.1984), we explained that the "claim preclusion" aspect of res judicata bars the relitigation of any claim "that was, or *might have been*, raised in respect to the subject matter of the prior litigation." *Id.* (emphasis in original) (citations omitted). "Issue preclusion" or "collateral estoppel," on the other hand, prohibits relitigation "of any factual or legal issue that was *actually* decided in previous litigation 'between the parties, whether on the same or on a different claim.'" *Id.* (emphasis in original) (quoting Restatement, Second, Judgments § 27 (1982)). We emphasized that "[a]n issue may be "actually" decided even when it is not *explicitly* decided, for it may have constituted, logically or practically, a necessary component of the decision reached." *Id.* (emphasis in original). *See* Wright, Miller & Cooper, *supra*, § 4402.

With the exception of the conflict of interest allegations discussed in section B below, we have no doubt that the issues and claims litigated in the Adversary Proceeding were substantially the same issues and claims with respect to the Banks's alleged oral promise that defendant Bogosian sought to litigate with respect to the Belmont Note in the District Court Action. As the district court noted in granting summary judgment, Belmont had every incentive to litigate those matters exhaustively in the Adversary Proceeding. On appeal, Bogosian's principal contention is that the usual rules of res judicata should not apply in this case.

■ Before turning to this argument, we briefly consider and reject three other arguments now made by Bogosian. First, Bogosian argues that the district court should not have applied res judicata because she was not a party nor in privity with a party in the Adversary Proceeding. The court below, however, accurately stated that,

It is undisputed that Mrs. Bogosian is an officer of [Belmont], that she participated directly in obtaining the loan for [Belmont] to purchase the Newport and Middletown, R.I. properties, that she signed the Guaranty of the [Belmont] indebtedness at issue in this case, and that she was very active in the bankruptcy proceedings. Thus, privity exists between defendant Bogosian and [Belmont].

Bogosian points to nothing that makes us doubt either the conclusion of law or the finding of fact by the district court. *See* Restatement, Second, Judgments § 59(3)(a) (1982) (judgment against a closely-held corporation is conclusive as to shareholder who actively participates in an action on behalf of the corporation, unless interests of the shareholder and corporation are so different that the shareholder deserves an opportunity to relitigate issues).

■ Second, Bogosian contends that the bankruptcy court did not have jurisdiction to adjudicate the validity of her guaranty and that "the preclusive effect of a Bankruptcy Court must reflect the reality of its limited jurisdiction." *See Latham v. Wells Fargo Bank*, 896 F.2d 979, 983 (5th Cir.1990). Bogosian forgets, however, that res judicata includes issue, as well as claim, preclusion. She does not dispute that the bankruptcy court properly exercised its jurisdiction over Belmont's claims and that the issues necessarily considered in Belmont's claims were the same as in Bogosian's counterclaims in the District Court Action. Given that Bogosian and Belmont were in privity, Bogosian is barred from litigating those same issues again, even if the bankruptcy court did not have jurisdiction over her personal claims.

■ Third, Bogosian contends that the Bank procured the Belmont Decision through discovery fraud, by failing to produce an internal Bank memorandum in the Adversary Proceeding. The memo, prepared by the loan officer, lists as "Source of Repayment" for the Belmont Note the "Sale of assets/Conversion of property for resale and refinance a mortgage." The document, to our eyes, simply lists potential sources of repayment of the loan; it does not amount to evidence of a promise not to require repay-

ment until after the completion of Belmont's project. But even if the document were more persuasive, there is absolutely nothing in the record suggesting that the Bank engaged in discovery fraud, as the bankruptcy court specifically *refused* to allow Belmont to engage in discovery before the Belmont Decision. *In re Belmont,* 116 B.R. at 24. Moreover, the document was produced in the District Court Action several weeks before the Belmont Decision in the Adversary Proceeding; at no time did Belmont attempt to bring it to the attention of the bankruptcy court.

Bogosian's fourth and principal argument here is that the Bank must be deemed by implication to have "waived" any res judicata effects of the Belmont Decision when it agreed, in the Consent Order, to have the merits of the counterclaims decided in the District Court Action rather than in the Bankruptcy Appeal. Bogosian contends that the parties' obvious desire to have their dispute decided in the District Court Action rather than in the Bankruptcy Appeal leads ineluctably to the conclusion that the res judicata effects of the Belmont Decision were to be permanently cancelled.

This scenario, however, ignores the fact that, under the Consent Order, the Bankruptcy Appeal was merely to be continued *nisi,* with both parties being expressly entitled to initiate further proceedings in that appeal at will. Nothing was said about waiving the res judicata effects of the Belmont Decision, there being no need to do so since, as previously discussed, any attempt of the Bank to raise a res judicata defense in the District Court Action could be counteracted by Belmont's reopening of its Bankruptcy Appeal.[1] It was when Belmont voluntarily dismissed its bankruptcy petition and the Bankruptcy Appeal was "passed," that the happy balance of power that had supported the compromise came to an end. The Bank

could thereafter assert res judicata with impunity.

In effect, Bogosian is asking this Court to supply in the Consent Order a missing contract term to which the parties never expressly agreed, namely, an agreement by the Bank to forego its res judicata defense. We see no reason to do so. Nothing in the Consent Order, expressly or by implication, shows an intent by the Bank to waive its res judicata defense. If the parties foresaw the possibility of the current situation, their failure to have provided for it could well have been due to their inability to find common ground. *See* E. Allan Farnsworth, *Contracts* §§ 7.15–16 (1982). We see nothing unjust about leaving the parties where they have found themselves, i.e., without any special agreement, express or implied, that would bar use of the still viable res judicata defense.

This holding is supported by the fact that Bogosian could easily have avoided this result either by seeing that Belmont's bankruptcy proceeding was maintained or by promptly reopening the Bankruptcy Appeal. She failed to do either. Now, after failing to protect herself, she asks this court to step in and provide protection—either by reading into a Consent Order an agreement that does not exist, or by requiring the district court to amend its order dismissing the Bankruptcy Appeal.

Under *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), we are not required to do either. There, the Supreme Court held that a judgment could be accorded res judicata effect in a subsequent litigation even though the original judgment was rendered unreviewable because it was dismissed as moot by the appellate court. The Court acknowledged that the usual course is for the appellate court to dismiss the appeal with instructions to vacate the judgments below, destroy-

---

1. Nor would the unresolved res judicata issue have lingered to destabilize any judgment later reached in the District Court Action. Res judicata is an affirmative defense. If the Bank had allowed the District Court Action to proceed to judgment without raising it, res judicata would have been deemed waived at that point. Wright, Miller & Cooper, *supra,* § 4405. The judgment

would stand, even if inconsistent with the Belmont Decision. Of course, the chances are slight that the judgments would remain inconsistent for long, as the Bankruptcy Appeal could then be reopened and the Belmont Decision reversed (if need be, to achieve consistency), the same judge and court being in control of both proceedings.

ing their preclusive effects. But when the party that lost below fails to *request* a vacatur of the lower court judgments, the appellate court does not err when it allows the judgments to stand.

> The case is therefore one where the [appellant], having slept on its rights, now asks us to do what by orderly procedure it could have done for itself. The case illustrates not the hardship of *res judicata,* but the need for it in providing terminal points for litigation.

*Id.* at 41, 71 S.Ct. at 107.

Here, too, Bogosian and Belmont "slept on [their] rights" at their peril. The district court's "passing" of the Bankruptcy Appeal did not automatically vacate the Belmont Decision, and absent a request for vacatur, it was not error for the district court to fail to order vacatur *sua sponte.*

Five months after the district judge dismissed the appeal and over four months after the Bank raised its res judicata defense, Belmont finally moved pursuant to Rule 60(b) that the judge amend his order to make clear that the Belmont Decision had no preclusive effect. Even if such a motion could be generously construed as a request for vacatur, it is doubtful that such a request sufficed under *Munsingwear.* As the district court noted, Belmont should have acted sooner to protect its right to an appeal. As in *Munsingwear,* "if there is hardship in this case, it was preventable." *Munsingwear,* 340 U.S. at 39, 71 S.Ct. at 106.

Bogosian might have presented a colorable argument that the district court erred in passing the Bankruptcy Appeal when it was not in fact moot. While there is no controlling law in this Circuit, the apparent majority rule in other jurisdictions is that bankruptcy courts may continue to exercise jurisdiction over pending adversary proceedings even after a dismissal of a related bankruptcy petition. *See* 2 Collier on Bankruptcy ¶ 349.03 & nn. 4a, 4b (1993); Bankruptcy Service, L.Ed. § 3C:99 (1989). Some courts continue to exercise jurisdiction "for cause shown" under 11 U.S.C. § 349(b). *See, e.g., In re Morris,* 950 F.2d 1531 (11th Cir.1992). Some retain jurisdiction for other reasons or as a matter of course. *See, e.g., In re Carraher,* 971 F.2d 327 (9th Cir.1992); *In re Pocklington,* 21 B.R. 199, 7 Collier Bankr.Cas.2d 185 (Bankr.S.D.Cal.1982); *In re Lake Tahoe Land Co.,* 12 B.R. 479, 4 Collier Bankr. Cas.2d 1089 (Bankr.D.Nev.1981).

But Belmont never contested the dismissal of the appeal below, and neither Bogosian nor Belmont has made the argument on appeal that the dismissal was in error. The argument is therefore waived. Moreover, even if the dismissal was in error, Belmont could have cured any harmful effect with a simple motion to vacate the Bankruptcy. Court's judgment. Under *Munsingwear,* Belmont must share the responsibility for seeing to it that lower court judgments do not prejudice them later.

We therefore affirm the district court's decision to apply res judicata in the District Court Action. We also affirm the district court's denial of Belmont's Rule 60(b) motion. Except for the one fraud claim based on conflict of interest described below, we affirm the district court's grant of summary judgment against Bogosian as to the Belmont Note.

## B. *The Conflict of Interest Claim*

█ In Bogosian's amended counterclaims, she set forth a claim of fraud. She based much of this claim on allegations that were, or could have been, litigated in the Adversary Proceeding or on allegations that pertained to the Bogosian Note rather than the Belmont Note. The district court properly granted summary judgment as to these allegations.

Bogosian made one factual allegation concerning the Belmont Note, however, that apparently could not have been considered in the Adversary Proceeding. She claimed that before agreeing to borrow the money for the Newport and Middletown properties from the Bank, she sought assurances that the Bank was not conducting business with any of her brothers. Given the acrimonious dissolution of several businesses in which she shared interests with her brothers, Bogosian was allegedly concerned that a Bank relationship with the brothers would amount to a conflict of interest. According to Bogosian,

the Bank falsely represented that it was not engaging in business with her brothers, fraudulently inducing Belmont to accept a loan and to execute the Belmont Note.

In granting summary judgment, the district court barred this counterclaim along with all the others. Issue preclusion would not have barred this claim, however. A fraud in the inducement claim pertains to an inducement to enter into a contract rather than to the contract terms themselves. Such a claim would not normally, therefore, be decided on statute of frauds or parol evidence grounds. The district court may have believed that this claim could have been raised in the Adversary Proceeding, hence was properly barred on claim preclusion grounds. Without knowing more, however, we cannot affirm the summary judgment dismissal of this claim. On appeal, Bogosian asserts that she discovered this conflict of interest misrepresentation only after the District Court Action began. Her assertion is hardly air-tight: she could have learned about this misrepresentation after the District Court Action commenced but still in time to bring it to the attention of the bankruptcy court in the Adversary Proceeding. Nevertheless, in the light most favorable to Bogosian, it would be reasonable to infer that Belmont did not know the full dimensions of its fraud claim at the time of the Belmont Decision. Depending on the reason for Belmont's ignorance, claim preclusion might not apply. *See* Wright, Miller & Cooper, *supra*, § 4415.

■ As the district court's reasoning in barring this particular fraud claim was not clear from its order, we think it is best to vacate summary judgment as to this claim and remand for further proceedings. The district court may choose to accept additional argument as to whether the allegations of conflict of interest could have been raised in the Adversary Proceeding or whether for any other reason the claim should now be barred. Or else the court may determine *inter alia* whether Bogosian has created a genuine issue of material fact on the merits of the claim so as to survive summary judgment.

## III.

We turn last to the Bogosian Note. Bogosian admits executing the Bogosian Note for $242,408 on January 19, 1989. She does not dispute on appeal the district court's findings that it was payable (at latest) 18 months later and has not to date been paid. Nevertheless, she has alleged that the Bank made certain materially false representations in order to encourage her to accept personal liability for one half of E & J's outstanding debt to the Bank. She argues on appeal that she created a genuine issue of material fact as to claims of fraud and breach of fiduciary duty, and that these claims should have survived summary judgment.

■ Her fraud claim rests on two factual allegations. First, Bogosian declares that shortly before she executed the Bogosian Note, the Bank had begun the process of terminating her credit and calling in her Belmont Note guaranty. Second, she avows that the Bank "feigned an interest" in providing additional financing to her if she executed the Bogosian Note.

The district court held that a fraud claim based on these allegations could not succeed as a matter of law. We agree. As to the first allegation, the Bank was entitled to monitor Bogosian's creditworthiness without keeping her updated on its assessment. *See Centerre Bank of Kansas City, N.A. v. Distributors, Inc.*, 705 S.W.2d 42, 52 (Mo.Ct. App.1985). As to the second, we find nothing in the record to make us doubt the district court's finding that the Bank made no material misrepresentation, proof of which is necessary to substantiate a claim for intentional fraud. Given the negotiating context in which anyone with Bogosian's business sense should have known that the Bank had a legitimate interest in non-committal encouragement, Bogosian's claim that the Bank "feigned interest" is simply too thin a reed on which to base a fraud claim. Indeed, it is difficult to see how her version of the facts amounts to an allegation of misrepresentation at all.

■ Bogosian also attempted to make out a breach of fiduciary duty claim against the Bank, pointing primarily to her long-term

business relationship with Bank loan officer Robert Baggessen, and to the fact that she had given him authority to withdraw funds from several of her accounts to make payments on her and her companies' debts. In order to evaluate whether a fiduciary relationship existed, the district court considered several factors: (1) the reliance of Bogosian on the Bank; (2) the relationship of the parties prior to the transaction complained of; (3) the parties' relative business capacities; and (4) Bogosian's readiness to follow the bank's guidance in complicated transactions. *See Simpson v. Dailey*, 496 A.2d 126, 129 (R.I.1985). The district court, noting that Bogosian was a sophisticated and experienced businessperson who was represented by counsel at all relevant times, found that no fiduciary duty had been violated.

Again, we agree. We have previously noted that courts are split on whether a fiduciary relationship may exist between a bank and a borrower. *Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9, 16 (1st Cir.1987). No state or federal court in Rhode Island appears to have since found such a relationship to exist. *See Fleet National Bank v. Liuzzo*, 766 F.Supp. 61, 68 (D.R.I.1991) (granting summary judgment in favor of lender, finding no evidence that lender and borrower intended a fiduciary relationship beyond relationship of debtor-creditor).

But as in *Reid*, where we upheld a directed verdict denying a claim based on fiduciary duty, the facts here are such that we need not decide the broader legal issue. A good business relationship with a banker, with whom one has discussed one's underlying business at length, is not enough. Some kind of dependency for advice that makes the relationship more than a normal banker-client relationship is necessary. *See Reid*, 821 F.2d at 17 (applying Maine law). We do not believe that a reasonable jury could have found that such a special relationship existed here. We therefore affirm the district court's grant of summary judgment against Bogosian as to the Bogosian Note.

## IV.

In conclusion, we affirm the grant of summary judgment against appellant Bogosian as to the Bogosian Note. We also affirm summary judgment as to the Belmont Note, except for the fraud in the inducement claim based on allegations of conflict of interest. We remand to the district court for further proceedings on that claim. We also affirm the district court's denial of Belmont's Rule 60(b) motion for the district court to amend its order dismissing the Bankruptcy Appeal.

*Affirmed in part and vacated and remanded in part. Each party shall bear its own costs of this appeal, without prejudice to appellee's right to recover its own costs of this appeal from appellant if appellee prevails on remand.*